UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| CYNTHIA M. CAVANAUGH,      )<br>    Plaintiff,      )<br>      )<br>    v.      )<br>      )<br>JO ANNE B. BARNHART,      )<br>COMMISSIONER, SOCIAL      )<br>SECURITY ADMINISTRATION,      )<br>    Defendant.      ) | CAUSE NO.:  4:04-CV-0078-PRC |

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Cynthia M. Cavanaugh, on November 2, 2004, and a Brief in Support of Complaint [DE 15], filed on April 2, 2005. The Plaintiff seeks judicial review and reversal of a final decision by the Defendant, the Commissioner of the Social Security Administration ("Commissioner"), in which the Plaintiff was denied Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the following reasons, the Court denies the Plaintiff's request to reverse and remand the decision of the Commissioner.

**PROCEDURAL HISTORY**

On October 22, 1998, the Plaintiff filed an application for SSI benefits claiming that her impairments rendered her unable to work on May 22, 1998. The Plaintiff's application was denied on January 28, 1999, and the Plaintiff did not file an appeal.

On April 27, 2000, the Plaintiff filed another application for SSI alleging that she became disabled on April 1, 1985.[1] The ALJ stated that the protective filing date was March 7, 2000. The Plaintiff's application for SSI benefits was denied on September 11, 2000. The Plaintiff's Request for Reconsideration was denied on December 11, 2000. On January 15, 2001, the Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The hearing before ALJ James R. Norris was conducted on May 24, 2002, in Indianapolis, Indiana. At the hearing, Dr. Emily Giesel, M.D., a physician, and Dr. David Jarmon, Ph.D., a psychologist, testified as medical experts. In addition, testimony was heard from the Plaintiff and a Vocational Expert, Michael Blankenship, C.R.C. On June 13, 2002, the ALJ issued a decision denying the Plaintiff's application for SSI benefits, finding that the Plaintiff was not disabled because, "[d]espite having impairments considered to be 'severe' under the Act, she can still perform her past relevant work as a taxi dispatcher or telemarketer." R. at 17. The ALJ's decision included the following findings:

(1)   The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

(2)   The medical evidence establishes that the claimant has obesity, asthma and osteoarthritis, "severe" impairments; that she has non-specified depression and anxiety, nonsevere impairments; and that she does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No.4.

(3)   The claimant retains the residual functional capacity to perform a wide range of light work.

(4)   The claimant's subjective complaints and allegations concerning the severity of her impairments are not consistent with the objective medical and other evidence of record.

---

[1] While the Plaintiff alleges that her disability stems from April 1, 1985, the Administrative Law Judge only evaluated the Plaintiff's claim as of April 2000, "the month after the application for benefits was filed, because she [wa]s ineligible for benefits prior thereto." R. at 17.

>   (5)   The claimant is able to perform her past relevant work as a taxi dispatcher or telemarketer.
>
>   (6)   The claimant has not been disabled, within the meaning of the Social Security Act, at any time relevant to this decision.

R. at 20.

On August 13, 2002, the Plaintiff filed a Request for Review of Hearing Decision/Order with the Appeals Council. On September 10, 2004, the Appeals Council denied the Plaintiff's request for review citing that there was no basis under 20 C.F.R. § 416.1470 to grant the Plaintiff's request for review. Therefore, the ALJ's decision of June 13, 2002, became the final decision of the Commissioner.

The Plaintiff filed her Complaint in this Court on November 2, 2004, seeking review of the final decision of the Commissioner on her April 27, 2000 application. On April 2, 2005, the Plaintiff filed her Brief in Support of Complaint. On July 19, 2005, the Commissioner filed a Defendant's Memorandum in Support of the Commissioner's Decision. On August 8, 2005, the Plaintiff filed her Reply Brief.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**FACTS**

**A. Background Information**

The Plaintiff was born on December 18, 1969, and was 32 years old at the time of the ALJ's decision. The Plaintiff has a General Equivalence Degree as well as one completed semester at a

specialized vocational school for computer training. The Plaintiff's work history includes past jobs as a taxi dispatcher and a telemarketer.

### B. Medical Evidence

*1. Relevant Evidence Before the Plaintiff Protectively Filed Her Application for SSI Benefits on April 27, 2000*

On July 20, 1994, Dr. Judy L. Davis, M.D., examined the Plaintiff and diagnosed her with a lumbosacral strain. Dr. Davis noted that the Plaintiff is obese resulting in low back pain.

On October 29, 1996, Dr. Davis examined the Plaintiff and diagnosed her with chronic asthma. On January 13, 1997, Dr. Davis again examined the Plaintiff and diagnosed her with asthma with poor compliance. On January 28, 1997, Dr. Davis examined the Plaintiff for a third time and diagnosed her with an acute exacerbation of asthma and encouraged her to quit smoking.

On December 9, 1997, Dr. Donald E. Clayton, M.D., assessed the Plaintiff as suffering from bronchial asthma and acute sinusitis. Dr. Clayton also noted that the Plaintiff was currently pregnant.

On or about May 15, 1998, Dr. Clayton diagnosed the Plaintiff with chronic asthma and noted that a lack of air conditioning adversely affected her condition. On or about June 1, 1998, Dr. Clayton stated the Plaintiff's asthma is not life-threatening but instead well-controlled by medication.

On December 10, 1998, Dr. David G. Jarmon, Ph.D., performed a consultative psychological examination of the Plaintiff who alleged disability on the basis of depression and anxiety. The Plaintiff stated that she had many aches and pains and that her body was basically "falling apart." R. at 314. The Plaintiff also stated that she did volunteer work for three hours per day and that she

had two sons, ages thirteen and six months. After conducting a psychological evaluation, Dr. Jarmon diagnosed the Plaintiff with depressive disorder and anxiety disorder, noting that her physical problems of obesity and asthma were more disabling than her psychological condition.

On December 12, 1998, Dr. Sandeep Gupta, M.D., performed a consultative examination of the Plaintiff. Dr. Gupta reported that the Plaintiff suffered from asthma for which she took medication, significant obesity causing back, feet, and ankle pains, and possible carpal tunnel syndrome on the right side. However, Dr. Gupta also reported that the Plaintiff had normal posture and gait with no ataxia or unsteadiness, normal joints with no inflammation, and normal grip strength and dexterity. Dr. Gupta further reported that the Plaintiff could stand on her heels and toes and could squat.

On or about January 5, 1999, a State Agency medical consultant reviewed the evidence of record and acknowledged that the Plaintiff suffered from asthma and obesity, but found the Plaintiff capable of performing light work.

On or about January 21, 1999, a State Agency psychological consultant reviewed the evidence of record and found that the Plaintiff did not have a "severe" mental impairment.

On January 28, 1999, the Plaintiff went to the emergency room complaining of chest pains, and the Plaintiff was diagnosed with pleuritic chest pain and asthma.

*2. Relevant Evidence After the Plaintiff Protectively Filed Her Application for SSI Benefits on April 27, 2000*

On June 16, 2000, a State Agency psychological consultant reviewed the evidence of record and found that the Plaintiff did not have a "medically determinable impairment." R. at 358.

5

On June 28, 2000, Dr. B. Khatib, M.D., performed a consultative examination on the Plaintiff. The Plaintiff complained of obesity which caused pain in her legs and in her right heel, pain and numbness in her hands, and asthma. Dr. Khatib reported that the Plaintiff had normal gait and station with no signs of ataxia or unsteadiness; that the Plaintiff could squat and bend over without difficulty; that the Plaintiff's joints did not evidence inflammation, effusion, or swelling; and that the Plaintiff had normal hand strength and fine finger manipulation.

On July 22, 2000, a State Agency medical consultant reviewed the evidence, including Plaintiff's weight, height, and pulmonary function testing results, and found that the Plaintiff could perform light work.

On December 5, 2000, a State Agency psychiatric consultant reviewed the evidence of record and found that the Plaintiff did not have a "medically determinable impairment." R. at 383.

On May 22, 2001, Dr. U.R. Kalapatapu, M.D., examined the Plaintiff for a voluntary psychiatric consult. The Plaintiff complained of depression for the past three years and low patience. Dr. Kalapatapu diagnosed the Plaintiff with "major depressive disorder, recurrent, severe without psychotic features" and cannabis abuse. R. at 162. Dr. Kalapatapu rated the Plaintiff's Global Assessment of Functioning ("GAF")[2] at 50 (serious, almost moderate symptoms), and the Plaintiff's highest GAF in the past year was 55. Dr. Kalapatapu recommended antidepressant

---

[2] The GAF scale is a measure of the individual's overall level of psychological, social, and occupational functioning, and does not include impairment in functioning due to physical or environmental limitations. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Text revision 2000). A GAF score of 41 to 50 is "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g. no friends, unable to keep a job)." *Id*. at 32. A GAF of 51 to 60 is "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers)." *Id*.

6

medication and outpatient psychotherapy. The record indicates that the Plaintiff received medication management from Dr. Kalapatapu from May 2001 through April 2002.

On October 21, 2001, the Plaintiff was examined at the Tippecanoe Community Health Clinic at which the Plaintiff was diagnosed with asthma and clinical obesity.

On March 29, 2002, Dr. Maria C. Alvarez, M.D., examined the Plaintiff and diagnosed her with right knee pain with episodic pain and swelling, hypertension, osteoarthritis, and clinical obesity. Dr. Alvarez's impression was that there was no deep venous thrombosis but severe degenerative arthritis bilaterally.

On April 24, 2002, Dr. Alvarez again examined the Plaintiff and diagnosed her with osteoarthritis, hypertension, increased blood pressure, and chronic obesity.

**C. Medical Expert's Testimony Presented at the May 24, 2002 Hearing**

At the administrative hearing before the ALJ held on May 24, 2002, Dr. Emily Giesel, M.D., testified as a medical expert. Dr. Giesel indicated that the Plaintiff had asthma, severe knee osteoarthritis, and severe obesity. Dr. Giesel opined that the Plaintiff would be limited to sedentary work consisting of standing and walking for no more than ten minutes at a time and one hour per day.

Also at the May 24, 2002 hearing, Dr. Jarmon, the psychologist who examined the Plaintiff on December 10, 1998, testified as a medical expert. Dr. Jarmon testified that when he examined the Plaintiff there were no severe or significant psychological limitations. Dr. Jarmon further testified that Dr. Kalapatapu's report assessed a GAF of 50, which would typically suggest some serious symptoms, but that the report offered "pretty good" findings and did not identify any specific

7

functional limitations. Dr. Jarmon added that the only additional evidence bearing on the Plaintiff's mental status was a medication log, but that it did not provide any information regarding diagnosis, treatment, or progress.

### D. Plaintiff's Testimony at May 24, 2002 Hearing

At the administrative hearing before the ALJ held on May 24, 2002, the Plaintiff testified that she was unable to work because of arthritis in her legs and knees as well as pain in her knees, back, heels, and legs that limited her ability to stand and walk. She testified that she could walk about 15-20 feet before she would have to stop, and stand for about 10-15 minutes without severe pain. In one day, the Plaintiff estimated that she could stand for about one and one-half hours. The Plaintiff stated that she cared for her four-year old son with some assistance from her sister. R. at 402-4.

### E. Vocational Expert's Testimony at May 24, 2002 Hearing

Michael Blankenship, C.R.C., testified as a vocational expert ("VE") at the May 24, 2002 administrative hearing before the ALJ. In response to a hypothetical posed by the ALJ regarding the available work to be performed by a person limited to sedentary work that involved standing for only fifteen minutes at a time, walking for 15-20 feet at a time, and being on his or her feet for one and one-half hours total per day, the VE testified that the hypothetical person could perform "a fairly wide berth of sedentary jobs which would essentially include all the unskilled jobs and certainly a variety of semi-skilled jobs including those that would be a part of the past relevant work." R. at 423-24. The VE testified that there were about 18,271 unskilled, sedentary jobs. When the ALJ

modified the hypothetical question to include light work, the VE indicated that even "a greater diversity of job opportunities" would be available to the hypothetical person. R. at 424-25. The VE testified that there were about 226,092 unskilled jobs that involved light work.

### F.  ALJ's Decision

In reaching his determination to deny SSI benefits, the ALJ applied the five-step analysis for analyzing disability claims.  At step one, the ALJ determined that the Plaintiff did not engage in substantial gainful activity at any time relevant to his decision.  At step two, the ALJ determined that there was "objective medical evidence" of the Plaintiff's obesity, asthma, and osteoarthritis, which are "severe" impairments because they interfere with the Plaintiff's ability to perform basic work activities. R. at 18.  At step three, the ALJ determined that the Plaintiff's "severe" impairments were not attended by medical signs or laboratory findings and thus failed to meet or equal in severity any impairment in the Listing of Impairments found in Appendix 1, Subpart P, Regulations No. 4.  At step four, with regard to the Plaintiff's residual functional capacity ("RFC"), the ALJ determined that the Plaintiff retained the RFC to perform a wide range of light work, which, according to the VE, included the Plaintiff's past work as a taxi dispatcher and telemarketer.  Therefore, the ALJ determined that the Plaintiff's past work was within her residual functional capacity and thus she was not disabled and not entitled to SSI benefits under Title XVI of the Social Security Act.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him or her from doing previous work, but considering age, education, and work experience, it must also prevent him or her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e), (f) & 416.920(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). The Seventh Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past relevant work; and (5) whether the claimant is capable of performing work in the national economy. Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original); *see also* 20 C.F.R. §§ 404.1520(a)(4)(I)-(iv) & 416.920(a)(4)(I)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). At the fourth and fifth steps, the ALJ must consider an assessment

of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite [her] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The ALJ must assess the RFC based on all the relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski*, 245 F.3d at 888. The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 995 (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**ANALYSIS**

The Plaintiff does not dispute the ALJ's findings as to steps one through three in the five-step inquiry to evaluate whether she is entitled to SSI benefits. However, the Plaintiff does dispute the ALJ's findings with regard to the Plaintiff's RFC arguing that the ALJ did not properly evaluate

both her psychological and physical RFC.  Specifically, the Plaintiff argues that (1) the ALJ did not make any psychiatric limitation finding even though Dr. Kalapatapu found a significant level of psychiatric problems; and (2) the ALJ considered but failed to follow Dr. Giesel's opinion and testimony, which she argues was supported by the objective medical evidence of record.[3]  It appears that, with regard to each argument, the Plaintiff asserts that there is a lack of substantial evidence to support the ALJ's decision, particularly in light of other relevant evidence.  The Commissioner responds that (1) in evaluating the Plaintiff's mental condition, the ALJ considered the State Agency medical and psychological consultants, Dr. Jarmon's testimony, and Dr. Kalapatapu's report; and (2) the ALJ reasonably declined to follow Dr. Giesel's opinion because it was not consistent with the medical evidence of record and, even if the ALJ had adopted Dr. Giesel's opinion, the VE's testimony indicates that the Plaintiff could have performed her past work.

This Court will only reverse an ALJ's determination if the findings are not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *See Clifford*, 227 F.3d at 869.  Because the Plaintiff does not allege that the ALJ applied an erroneous legal standard, the Court will only consider whether the ALJ's findings are supported by substantial evidence.  The Court will consider the Plaintiff's arguments as substantial evidence arguments and will address each argument in turn.

---

[3] In addition to the above two arguments, the Plaintiff states that the ALJ "did not properly evaluate [the Plaintiff's] credibility since he rejected the limitations of Dr. Giesel which were closer to the subjective complaints of pain given by [the Plaintiff]."  Pl. Br. at 13.  While the Plaintiff invokes credibility language, the Court finds that this is not a credibility argument.  The Plaintiff offers no examples or specifics from her testimony at the May 24, 2002 hearing in which the ALJ failed to properly credit her testimony in terms of subjective complaints or any other relevant testimony.  Further, the Plaintiff cites no law in support of her "credibility" argument.  Instead, the Plaintiff appears to be arguing that the ALJ failed to sufficiently consider Dr. Giesel's opinions in his determination to deny SSI benefits.  The Court will consider this argument as a substantial evidence issue, not a credibility determination of the Plaintiff's testimony.

13

*1. Dr. Kalapatapu's Report from May 22, 2001 Regarding the Plaintiff's "Psychiatric Limitations"*

The Plaintiff argues that the ALJ did not find any psychiatric limitation despite Dr. Kalapatapu's finding a significant level of psychiatric problems.  For support, the Plaintiff relies on Dr. Kalapatapu's psychiatric examination on May 22, 2001, during which Dr. Kalapatapu assessed the Plaintiff's GAF rating at 50, which indicates "serious, almost moderate symptoms."  R. at 161-63.  The Plaintiff argues that Dr. Kalapatapu further noted that the Plaintiff's highest GAF rating in the past year was 55.  Dr. Kalapatapu, a treating physician of the Plaintiff, diagnosed the Plaintiff with "major depressive disorder, recurrent, severe without psychotic features" and cannabis abuse.  R. at 162.  The Plaintiff argues that Dr. Kalapatapu's report and findings establish that the ALJ's determination that the Plaintiff retained the RFC to perform a wide range of light work was in error and not supported by substantial evidence.

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(d)(2); *Boiles*, 395 F.3d at 426 (citing *Clifford*, 227 F.3d at 870); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel*, 345 F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).  However, an ALJ is entitled to discount the medical opinion of a treating physician if inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Dixon*, 270 F.3d at 1178; *Clifford*,

227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).  The ALJ must discuss, at some level, how the evidence of record contradicts the treating physician's diagnosis.  *See Gudgel*, 345 F.3d at 470.

The Plaintiff argues that the ALJ ignored Dr. Kalapatapu's report on the Plaintiff's psychiatric limitations.  At the May 24, 2002 hearing, during the ALJ's examination of Dr. Jarmon, the ALJ specifically inquired into the Plaintiff's limitations to perform basic work activities from a mental standpoint, based on Dr. Jarmon's review of the record.  *See* R. at 421.  Dr. Jarmon responded that, after examining Dr. Kalapatapu's report and evaluation, the Plaintiff appeared not to suffer from "any severe significant psychological limitations."  *Id*.  Therefore, the Plaintiff's argument that the ALJ ignored Dr. Kalapatapu's report is unpersuasive.

The Plaintiff further argues that the ALJ improperly relied on Dr. Jarmon's report and diagnosis from his examination of the Plaintiff in December 1998, and instead should have relied on Dr. Kalapatapu's report from May 2001 because Dr. Kalapatapu was a treating physician.  While Dr. Kalapatapu's report and diagnosis as a treating physician is entitled to "more weight," *see Gudgel*, 345 F.3d at 470 (citations omitted), as noted above, an ALJ may discount a treating physician's opinion if it is "inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent."  *Skarbek*, 390 F.3d at 503.  At the May 24, 2002 hearing, Dr. Jarmon testified that he considered but declined to follow Dr. Kalapatapu's report and diagnosis.  *See* R. at 418-19.  In turn, the ALJ noted that "Dr. Jarmon found no significant psychological limitations attributable to the claimant's nonspecific depression and anxiety."  R. at 18.  In his decision, the ALJ determined that "the opinion of Dr. Jarmon, based on a full and fair consideration of the entire record, is in accord with that of the physicians at the Disability

15

Determination Service." R. at 19. In particular, the Court notes that a State Agency psychological consultant in January 1999 determined that the Plaintiff did not have a "severe" mental impairment, *see* R. at 332, and another State Agency psychiatric consultant in June 2000 determined that the Plaintiff had "no medically determinable impairment." R. at 358. Therefore, the ALJ, via Dr. Jarmon's testimony, determined that Dr. Kalapatapu's report and diagnosis was inconsistent with the opinions of the consulting physicians.

In addition, Dr. Jarmon testified that, based on his examination of the Plaintiff in December 1998, while the Plaintiff revealed non-specific depression and anxiety disorder, *see* R. at 315, her symptoms did not reveal any "severe significant psychological limitations." R. at 421. Dr. Jarmon also indicated that the Plaintiff "placed more emphasis on the physical aspects of her disability" and expressed that her physical problems were "more disabling" than her psychological problems. R. at 315. Further, after reviewing Dr. Kalapatapu's report, Dr. Jarmon testified that, despite Dr. Kalapatapu's mental status examination of the Plaintiff demonstrating a lack of significant mental or psychological problems,[4] Dr. Kalapatapu assessed a GAF of 50 which would indicate "some pretty serious symptoms." R. at 421. Based on this apparent internal inconsistency noted by Dr. Jarmon in his testimony, the ALJ declined to rely on Dr. Kalapatapu's report and diagnosis.

Moreover, while the Plaintiff seems to place great emphasis on Dr. Kalapatapu's assessment of the GAF rating of 50, the GAF scale measures and "reports a 'clinician's assessment of the

---

[4]Dr. Jarmon specifically referenced Dr. Kalapatapu's mental status examination in the May 22, 2001 report, which stated that the Plaintiff was

> relevant, coherent, and goal directed in her conversation. Her thought processes were connected and logical; thought contents revealed absence of suicidal or homicidal ideations or hallucinations. She was not assessed to be delusional. She was oriented times three and her memories for recent and remote events were assessed to be intact. She appears to be functioning at an average range of intellectual functioning.

R. at 162.

individual's overall level of functioning'" and is used to make treatment decisions. *Sims v. Barnhart*, 309 F.3d 424, 427 (7th Cir. 2002) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)). The GAF scale is "intended to be used to make treatment decisions, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart,* No. 02-4302, 69 Fed. Appx. 775, 780 (7th Cir. 2003) (internal citations omitted) (citing *Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (holding that a GAF score may assist ALJ in formulating claimant's RFC but is not essential).

In conclusion, the ALJ considered and examined Dr. Kalapatapu's report from May 2001 as well as additional relevant evidence including reviews by State Agency psychological and psychiatric consultants conducted in January 1999 and December 2000; Dr. Jarmon's examination and report from 1998; and Dr. Jarmon's hearing testimony which was based, in part, on an examination of Dr. Kalapatapu's report from May 2001. After careful review, the ALJ declined to follow Dr. Kalapatapu's report instead relying on Dr. Jarmon's examination, the reviews by State Agency psychological and psychiatric consultants, and Dr. Jarmon's testimony, which all concluded that the Plaintiff possessed no significant mental limitations. As a result, the Court finds that there exists substantial evidence in support of the ALJ's determination not to follow Dr. Kalapatapu's report but rather to rely on Dr. Jarmon's testimony.

2. *Dr. Giesel's Report*

The Plaintiff argues that the ALJ "considered but did not follow" Dr. Giesel's opinion and testimony on the basis that it was not supported by the objective medical evidence of record. The Defendant responds that the ALJ "reasonably declined to follow Dr. Giesel's opinion because it was

17

not consistent with the medical and other evidence of record." Def. Resp. at 8. In her reply brief, the Plaintiff cites Dr. Giesel's testimony that the Plaintiff can walk and stand for "no more than ten minutes at a time and no more than an hour a day total." Reply Br. at 4. The Plaintiff asserts that these limitations are "significantly more restricted" than the ALJ's hypothetical question to the VE regarding the amount of work a person could perform who could stand for only fifteen minutes at a time, walk for 15-20 feet at a time, and be on his or her feet for one and one-half hours total per day. *Id*. As a result, the Plaintiff asserts that the ALJ failed to properly assess her residual functional capacity at step four.

At steps one through four in the five-step inquiry to evaluate whether the claimant is entitled to benefits, the claimant bears the burden of proof. *See Knight*, 55 F.3d at 313. Dr. Giesel is a consulting physician who never personally examined the Plaintiff. Furthermore, the Court finds that the ALJ's determination as to the Plaintiff's physical RFC is supported by substantial evidence. In his decision, the ALJ held that "Dr. Giesel's opinion [wa]s considered, but not followed, as the objective medical evidence of record does not support a restriction of the claimant to sedentary work." R. at 19. The ALJ relied on the VE's testimony at the hearing as well as State Agency medical consults from January 1999 and July 2000 that both concluded that the Plaintiff could perform light work. *See* R. at 323-31, 374-82. In addition, Dr. Gupta's opinion in December 1998 and Dr. Khatib's opinion in June 2000 both reveal that the Plaintiff possessed normal posture and gait with no ataxia or unsteadiness; normal joints with no inflammation, effusion, or swelling; normal grip and hand strength; dexterity and finger manipulation; and the ability to stand on her heels and toes as well as to squat without difficulty.

The ALJ further held that while the claimant's obesity restricts her ability to work, "her asthma and osteoarthritis, while given consideration, do not warrant further reduction of her functional capacity below light work." *Id*. Accordingly, the Court finds that the ALJ's determination to not follow Dr. Giesel's testimony is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination regarding the Plaintiff's residual functional capacity was supported by substantial evidence. Accordingly, the Court **DENIES** the Plaintiff's Brief in Support of Complaint [DE 15]. The Court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 5th day of December, 2005.

s/ Paul R. Cherry<br>
MAGISTRATE JUDGE PAUL R. CHERRY<br>
UNITED STATES DISTRICT COURT

cc: All counsel of record